UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Burlholme Congregation of Jehovah's Witnesses, *et al.*, <br>     *Plaintiffs,* <br><br>     v. <br><br> Mark O'Donnell, <br>     *Defendant.* | Civil Action No. 2:24-cv-304 |

**BRIEF IN SUPPORT OF MARK O'DONNELL'S
MOTION FOR PROTECTIVE ORDER**

  Defendant Mark O'Donnell respectfully seeks a protective order pursuant to Fed. R. Civ. P. 26(c), recognizing his right, under the Pennsylvania Shield Law and the First Amendment, to refuse to disclose the identity of his confidential sources.

  At the core of this case is Mr. O'Donnell's participation in an online video and teleconference meeting held on February 16, 2023 between the elders of eleven Jehovah's Witnesses congregations in Pennsylvania and their attorneys. Mr. O'Donnell has asserted as a defense that he was invited to attend by a participating elder. Mr. O'Donnell received this invitation from a whistleblower as a reporter, and both the Pennsylvania Shield Law and the First Amendment entitle Mr. O'Donnell to shield the whistleblower's identity from Plaintiffs. Forced disclosure of the identity of his source would violate Mr. O'Donnell's rights, would severely impede his work as a journalist, and would leave the confidential source open to retaliation. The Shield Law and the reporter's privilege exist to prevent these harms.

1

Plaintiffs have sought the name of this whistleblower in discovery. In addition, Plaintiffs have demanded that Mr. O'Donnell identify "each Jehovah'sWitness that [he has] communicated with regarding the faith of the Jehovah's Witnesses in the last five (5) years." A full response to this interrogatory would require Mr. O'Donnell to reveal other journalistic sources and expose those people, as well, to retaliation by the Church. Mr. O'Donnell has asserted his privilege not to reveal this information in discovery and now seeks an Order upholding that privilege. Plaintiffs oppose this relief.

I.  **Factual Background**

Mr. O'Donnell is an investigative journalist who investigates and publishes information regarding child sexual abuse within Jehovah's Witness congregations and the failure of such congregations and the broader Jehovah's Witness leadership to report or otherwise address such reports. Exhibit A, Declaration of Mark O'Donnell ¶ 1 ("O'Donnell Decl."). In the course of that work, Mr. O'Donnell frequently speaks with sources who will only speak to him confidentially because they fear exposure and retribution. O'Donnell Decl. ¶¶ 11, 13. As part of his investigations, Mr. O'Donnell was contacted by a confidential source who invited him to call into the February 16, 2023 meeting. O'Donnell Decl. ¶ 14.

If Mr. O'Donnell cannot protect the identity of his confidential sources, he will be impaired in his journalistic ability to investigate the Jehovah's Witnesses. O'Donnell Decl. ¶¶ 12-13. The source here, like many of Mr. O'Donnell's sources are, in effect, "whistleblowers" who seek to assist Mr. O'Donnell in his investigations, but are fearful of retribution if they offer that assistance publicly. O'Donnell Decl. ¶¶ 13-

2

14. If exposed, those sources face harsh consequences. O'Donnell Decl. ¶¶ 11, 15-20. As Mr. O' Donnell knows first-hand, to be publicly identified as a critic of the Jehovah's Witnesses risks banishment from the community, *i.e.*, being "disfellowshiped"[1] and shunned by family as well as friends and all other Jehovah's Witnesses. O'Donnell Decl. ¶¶ 15-20. The confidential informant here risks just such severe harm if their identity is revealed, as do all of Mr. O'Donnell's sources who are current or former Jehovah's Witnesses. O'Donnell Decl. ¶ 11.

---

[1] The Ninth Circuit has defined "disfellowship" in an often-cited passage from *Paul v. Watchtower Bible & Tract Society of New York*, as follows:

> The Witnesses are a very close community and have developed an elaborate set of rules governing membership. The Church has four basic categories of membership, non-membership or former membership status; they are: members, non-members, disfellowshiped persons, and disassociated persons. "Disfellowshiped persons" are former members who have been excommunicated from the Church. One consequence of disfellowship is "shunning," a form of ostracism. Members of the Jehovah's Witness community are prohibited—under threat of their own disfellowship—from having any contact with disfellowshiped persons and may not even greet them. Family members who do not live in the same house may conduct necessary family business with disfellowshiped relatives but may not communicate with them on any other subject. Shunning purportedly has its roots in early Christianity and various religious groups in our country engage in the practice including the Amish, the Mennonites, and, of course, the Jehovah's Witnesses.

819 F.2d 875, 876–77 (9th Cir. 1987). The Court went on to note that since 1981 the distinction between "disassociation" and "disfellowship" has been eliminated. *Id.* at 78.

3

## II. The Pennsylvania Shield Law Protects the Identity of Mr. O'Donnell's Confidential Source.

In cases with both federal and state law claims, federal courts apply federal privilege law.[2] Nonetheless, Pennsylvania's Shield Law should inform this Court's application of the First Amendment reporter's privilege: "In recognizing such a privilege, we may consider also the applicable state law, in this case Pennsylvania's Shield Law … The interests behind the Pennsylvania statute and the federal common law in this regard are congruent, each stemming from an independent base of authority but both leading to protection of the vital communication role played by the press in a free society. *Riley v. City of Chester*, 612 F.2d 708, 715 (3d Cir. 1979).

The Pennsylvania Shield Law, 42 Pa. C.S. § 5942, titled "Confidential communications to news reporters," provides:

> No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or any magazine of general circulation, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.

The Pennsylvania Supreme Court repeatedly has held that this statute offers journalists absolute protection from the compelled disclosure of a confidential source or of any information that could reveal the identity of a confidential source. *See*

---

[2] Federal Rule 26 and Federal Rule of Evidence 501 govern discovery in federal court proceedings. *Pearson v. Miller*, 211 F.3d 57, 66 (3d Cir. 2000). Where a case raises both federal and state claims, federal privilege law applies. *Id.* (noting "the problems associated with the application of two separate privilege rules in the same case are readily apparent . . . This court has resolved this potential conflict in favor of federal privilege law.").

4

*Castellani v. Scranton Times*, 956 A.2d 937, 948-51 (Pa. 2008) (citing and summarizing *Commonwealth v. Bowden*, 838 A.2d 740 (Pa. 2003); *Sprague v. Walter*, 543 A.2d 1078 (Pa. 1988); *Hatchard v. Westinghouse Broadcasting Co.*, 532 A.2d 346 (Pa. 1987); and *In re Taylor*, 193 A.2d 181 (Pa. 1963)); *see also McMullan v. Wohlgemuth*, 308 A.2d 888, 896 (Pa. 1972) ("[T]he Pennsylvania Legislature has wisely created an absolute statutory right of a newsman to preserve the confidentiality of his sources of information.").

The Pennsylvania Supreme Court has left no doubt as to the importance and intention of the Shield Law:

> [The Shield Law] must therefore, we repeat, be liberally and broadly construed in order to carry out the clear objective and intent of the Legislature *which has placed the gathering and the protection of the source of news as of greater importance to the public interest and of more value to the public welfare* than the disclosure of the alleged crime or the alleged criminal.

*In re Taylor*, 193 A.2d 181, 185–86 (1963) (italics in original); *Castellani*, 956 A.2d at 948 (quoting *In re Taylor*, 193 A.2d at 185–86). *See also Coughlin v. Westinghouse Broad. & Cable Inc.*, 780 F.2d 340, 343 (3d Cir. 1985) (Shield Law is to be "liberally construed in favor of the newspapers and news media" in order to "ensure that the Shield Law continues to serve its 'vital public function.'").

Following this instruction, trial courts have interpreted the Shield Law to cover websites such as Mr. O'Donnell's. In *Javens v. Doe*, 45 Med. L. Rep. 1808, 1811 (Beaver Cty. C.C.P. Mar. 7, 2017) (appended hereto as Exhibit B for the Court's convenience), a trial court held that the owner/publisher of a website that posts news is covered by the Shield Law. The court explained that because the website "is

5

available to anyone who wishes to access" it, the site "constitutes a newspaper of general circulation." *Id.* The court continued:

> The fact that the content is published online rather than in a traditional format is inconsequential considering the clear intent of the statute. There is no indication in the language of the Shield Law that its provisions are limited to publications printed in a traditional "hard copy" print format. Further, it is apparent that [the owner/ publisher] operates the website for the purpose of gathering, compiling and publishing news.

*Id.*

Courts interpreting similar statutes in other states have found that self-published online news websites such as Mr. O'Donnell's qualify for statutory shield protections. For instance, a California constitutional provision that protects "[a] publisher, editor, reporter, or other person connected with or employed upon a newspaper, magazine, or other periodical publication," has been held to protect a journalist of an online news site "devoted to news and information about Apple Macintosh computers." *O'Grady v. Superior Court*, 44 Cal.Rptr.3d 72, 76, 96-105 (Cal. App. 4th 2006), *as modified* (June 23, 2006). Likewise, New Jersey's Shield Law, which covers a person connected with "newspapers, magazines, press associations, news agencies, wire services, radio, television or other similar printed, photographic, mechanical or electronic means of disseminating news to the general public," N.J. Stat. Ann. §§ 2A:84A-21, 21a, has been held to protect the writer of a blog "self-described [as an] advocacy group that reports on alleged waste, corruption, and

mismanagement in Union County, New Jersey." *In re January 11, 2013 Subpoena by Grand Jury of Union Cnty.*, 75 A.3d 1260, 1262, 1266-1270 (N.J. Super. Ct. 2013).[3]

Here, as in *Javens*, Mr. O'Donnell operates a website, JWChildAbuse.Org, for the purpose of gathering, compiling, and publishing news about child sexual abuse within Jehovah's Witness congregations and the failure of church leaders to report or otherwise address this abuse. O'Donnell Decl. ¶ 5. The confidentiality of Mr. O'Donnell's sources is critical to being able to conduct this newsgathering. O'Donnell Decl. ¶ 13. And here, he has assured confidentiality to his source, as is his absolute right based on the Shield Law and the long-standing Pennsylvania Supreme Court precedent discussed above. O'Donnell Decl. ¶ 14. Because Mr. O'Donnell is a journalist who operates a publicly accessible news website he is entitled to the protection of Pennsylvania's Shield Law to protect his sources from disclosure through this proceeding.

---

[3] No Pennsylvania appellate court has addressed whether a self-published news site such as Mr. O'Donnell's qualifies for protection under the Pennsylvania Shield Law. As discussed below, however, Mr. O'Donnell is clearly entitled to protection under the First Amendment's qualified privilege for reporters. The Pennsylvania Supreme Court has discussed the overlap between the First Amendment Reporters' Privilege and the Pennsylvania Shield Law and recognized that the principal distinction isn't in **who** is covered but **what** is covered. *Castellani*, 956 A.2d at 950 n.11 (Pa. 2008). Specifically, the Shield Law's coverage is limited to "a reporter protecting his confidential sources," where the Reporters' Privilege applies more generally to a journalist's testimony. *Id.*

### III. The First Amendment Reporters' Privilege Protects the Identity of Mr. O'Donnell's Confidential Sources.

#### A. The Reporters' Privilege Applies to Mr. O'Donnell.

The Third Circuit has long recognized "a federal common law privilege, albeit qualified, to refuse to divulge [a journalist's] sources." *Riley v. City of Chester*, 612 F.2d 708, 714 (3d. Cir. 1979). That privilege "is deeply rooted in the first amendment." *United States v. Criden*, 633 F.2d 346, 356 (3d Cir. 1980). "A journalist's inability to protect the confidentiality of sources s/he must use will jeopardize the journalist's ability to obtain information on a confidential basis." *Riley*, 612 F.2d at 714. "The reporters' privilege also attempts to protect the source from retribution. If a practice in private industry is exposed by a person in a given employment hierarchy, he risks retribution at the hands of his superiors and his peers if he is identified as the source." *Criden*, 633 F.2d at 356.

To invoke the reporter's privilege, "'the individual claiming the privilege must demonstrate, through competent evidence, the intent to use the material in order to disseminate information for the public and such intent must have existed at the inception of the newsgathering process.'" *In re Madden*, 151 F.3d 125, 129 (3d Cir. 1998) (quoting *von Bulow v. von Bulow*, 811 F.2d 136, 142 (2nd Cir.1987)). "An individual may successfully claim the journalist's privilege if she is involved in activities traditionally associated with the gathering and dissemination of news, even though she may not ordinarily be a member of the institutionalized press." *In re Madden*, 151 F.3d at 129. As detailed in his sworn declaration submitted with this motion, Mr. O'Donnell has been investigating and reporting on allegations of child

8

sexual abuse and efforts to conceal it among Jehovah's Witnesses congregations since 2014. O'Donnell Decl. ¶¶ 1, 3-4. Although he is not "a member of the institutionalized press," he utilizes the traditional tools of newsgathering, such as cultivating sources with knowledge, and regularly disseminates his findings to the public through interviews, writings, and posting on his website, JWChildAbuse.Org. O'Donnell Decl. ¶¶ 5-6. Mr. O'Donnell received an invitation to participate in the February 16, 2023 Teams meeting from the confidential source at issue in this case as part of his investigative process. O'Donnell Decl. ¶¶ 2, 14. The reporter's privilege clearly applies to the name of Mr. O'Donnell's confidential whistleblower, as well as the other informants who make his work possible.

## B. Plaintiffs Cannot Pierce the Privilege.

Once the privilege has been invoked, the burden is on the party seeking disclosure to show that it should be overcome. *Riley,* 612 F.2d at 716. "When no countervailing constitutional concerns are at stake, it can be said that the privilege is absolute; when constitutional precepts collide, the absolute gives way to the qualified and a balancing process comes into play to determine its limits." *Criden*, 633 F.2d at 356. Thus, when considering whether the privilege may be pierced, the court must balance "the policies which give rise to the privilege and their applicability to the facts at hand against the need for the evidence sought to be obtained in the case." *Riley*, 612 F.2d at 716. That is, the Court must balance Mr. O'Donnell's constitutional protection and the welfare of his confidential sources against the purported need to identify the source.

9

"*Riley* isolated three criteria that must be met before a reporter can be compelled to disclose a confidential source. First, the movant must demonstrate that he has made an effort to obtain the information from other sources. Second, he must demonstrate that the only access to the information sought is through the journalist and her sources. Finally, the movant must persuade the court that the information sought is crucial to the claim." *Criden*, 633 F.2d at 358–59 (3d Cir. 1980).

### C. Both Mr. O'Donnell and his Confidential Sources Risk Severe Harm from Disclosure.

If Mr. O'Donnell's privilege is not upheld and the name of his informant protected, Mr. O'Donnell's journalism will be severely curtailed by creating fear and uncertainty among possible future informants. O'Donnell Decl. ¶¶ 12-13. This is precisely the harm that the Reporter's Privilege was created to avoid. "A journalist's inability to protect the confidentiality of sources s/he must use will jeopardize the journalist's ability to obtain information on a confidential basis." *Riley*, 612 F.2d at 714. As the Court in *Riley* stated, "[t]he interrelationship between newsgathering, news dissemination and the need for a journalist to protect his or her source is too apparent to require belaboring." *Id.*

Meanwhile, the whistleblower in this instance faces a real and severe threat of "disfellowship" or shunning from Jehovah's Witness congregations and followers. Courts have repeatedly recognized the gravity of the harm arising from shunning or ostracization from a religious community and specifically the Jehovah's witnesses. *Paul v. Watchtower Bible & Tract Soc. of New York, Inc.*, 819 F.2d 875, 879 (9th Cir. 1987) ("We believe that expulsion from a church or other religious organization can

constitute a serious emotional deprivation which, when compared to some losses of property or contract rights, can be far more damaging to an individual.") (citing *Baugh v. Thomas,* 265 A.2d 675, 677 (N.J. 1970)); *see also Cornerstone Church of Nashville, Inc. v. Guideone Ins.*, No. 3:20-CV-00956, 2021 WL 5054100, at *5 (M.D. Tenn. Nov. 1, 2021) (noting "severe" harm to abuse victim forced to "see his own religious community embracing his abuser."); *Bear v. Reformed Mennonite Church*, 341 A.2d 105, 107 (Pa. 1975) (noting extremely harmful consequences of "shunning"). Elsewhere courts have recognized such harm as a basis for confidentiality. *Doe No. 2 v. Kolko*, 242 F.R.D. 193, 197 (E.D.N.Y. 2006) (noting "claim of emotional and psychological harm, particularly in light of his ties to a very tight-knit religious community, is sufficient standing alone to establish special circumstances warranting anonymity.").

## IV. Conclusion

Mr. O'Donnell is a journalist and reporter for whom the preservation of the confidentiality of sources is critical to his ability to gather and report news. The Plaintiffs cannot overcome his claim of privilege. The harms disclosure of that information would cause are serious. Accordingly, Mr. O'Donnell respectfully asks for a Protective Order directing that the identity of Mr. O'Donnell's sources remain confidential.

Dated: April 4, 2025                    Respectfully Submitted,

*/s/ Mary Catherine Roper*
Mary Catherine Roper
John J. Grogan
David Nagdeman
LANGER GROGAN & DIVER PC
1717 Arch St., Ste 4020
Philadelphia, PA 19103
(215) 320-5660
mroper@langergrogan.com
jgrogan@langergrogan.com
dnagdeman@langergrogan.com

*Attorneys for Defendant*