UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Burlholme Congregation of Jehovah's Witnesses, *et al.*,<br>　　　　　*Plaintiffs,*<br><br>　　　　　v.<br><br>Mark O'Donnell,<br>　　　　　*Defendant.* | Civil Action No. 2:24-cv-304 |

**REPLY BRIEF IN SUPPORT OF MARK O'DONNELL'S
MOTION FOR PROTECTIVE ORDER**

In their opposition papers, Plaintiffs complain that they have expended considerable time and resources in a hunt for Mr. O'Donnell's informant and have been unable to identify that person. And, as noted in Mr. O'Donnell's opening brief, Plaintiffs not only seek to identify the whistleblower who invited Mr. O'Donnell to the Teams meeting on February 16, 2024, but also seek disclosure of each and every Jehovah's Witness with whom he has communicated "regarding the faith" in the last five years. In short, Plaintiffs seek to use this litigation to root out dissenters within their midst. That is not a proper purpose for litigation or the federal discovery process. And it is precisely the type of activity that the First Amendment Reporters Privilege exists to prevent.

With that in mind, the question before the Court is not whether Plaintiffs are able to identify Mr. O'Donnell's source for their own purposes, but whether Plaintiffs' need for that person's identity in this litigation outweighs Mr. O'Donnell's constitutional right to keep the information private. Mr. O'Donnell has properly

1

asserted the First Amendment Reporters Privilege.[1] It is Plaintiffs' burden to overcome this privilege, and they cannot do so.[2] The Court should grant Mr. O'Donnell's motion to protect the identities of the whistleblower in this case and the other whistleblowers and informants whom Plaintiffs seek to ferret out through this litigation.[3]

I. Defendant Raised the Privilege in a Timely Manner

Plaintiffs open their arguments by misstating the procedural record as to when Mr. O'Donnell first asserted his claim to privilege, claiming that he failed to assert his privilege to protect the identity of his source until February 10, 2025. That is untrue. Mr. O'Donnell's counsel raised that issue with Attorney Ashling Ehrhardt,

---

[1] Defendant, in his brief, also raised the Pennsylvania Shield Law as relevant to the Court's consideration of the application of the First Amendment privilege following *Riley v. City of Chester*, 612 F.2d 708 (3d Cir. 1979). *See id.* at 715 ("In recognizing such a privilege, we may consider also the applicable state law, in this case Pennsylvania's Shield Law … .").

[2] Plaintiffs make a great deal out of the "good cause" factors for a protective order under Rule 26(c) set out in *Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir. 1994). Those factors are generally applied in cases where parties are challenging protective orders over confidentiality or the disclosure of otherwise non-privileged information. That is because 26(b)(1) specifically excludes privileged information from the scope of discoverable information, *id.* ("Parties may obtain discovery regarding any nonprivileged matter that is relevant … ."), such that Rule 26(c)'s "good cause" should be presumed to be met where privilege is shown, *see, e.g., Fid. & Deposit Co. of Maryland v. McCulloch,* 168 F.R.D. 516, 522 (E.D. Pa. 1996) ("We further find that the attorney-client privilege provides sufficient 'good cause' under Rule 26(c) to grant the protective order with respect to these initial disclosures."). The Court's determination of the applicability of the privilege will thus be dispositive of the Pansy Rule 26(c) analysis.

[3] Plaintiffs, in fact, make no argument that they have a litigation need to identify *other* current or former Jehovah's witnesses who have provided information as part of Mr. O'Donnell's investigative activities, and so that aspect of Mr. O'Donnell's motion is unopposed.

one of the signatories to Plaintiffs' brief, at the parties' Rule 26(f) conference on November 13, 2024, the day *before* producing redacted documents on November 14, 2024. The fact that the parties discussed Mr. O'Donnell's intention to rely on his privilege is recorded in the parties' Joint Status Report Pursuant to Rule 26(f), filed on November 18, 2024 and docketed at ECF 38, which notes, at ¶ 7.b., Mr. O'Donnell's intention to file a "Motion for a Protective Order regarding Defendant's right to assert a reporter's privilege."

II. **Mr. O'Donnell Has Established that the Identity of the Confidential Informant Is Protected by the First Amendment Reporters Privilege**

Plaintiffs' principal argument against the privilege raised here is that Mr. O'Donnell does not qualify as a journalist and, at the time of the meeting, did not attend it with the requisite journalistic intent. These arguments are specious.

Mr. O'Donnell sets forth his journalist bona fides in his declaration describing his work investigating and reporting on child abuse and the cover-up of child abuse allegations within Jehovah's Witness congregations since 2014, including both work as a freelance journalist and operation of and publication through his website, JWChildAbuse.org. O'Donnell Decl. at ¶¶ 1-7, ECF 52-2. In response, Plaintiffs characterize Mr. O'Donnell as "nothing more than an uncredentialed, self-publishing blogger taking up space on the Internet," Pltfs. Br. at 9, and ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *id.*

Plaintiffs' arguments that Mr. O'Donnell does not qualify as a journalist are contrary to the law. There is no certification or training required to be a journalist under First Amendment law. "An individual may successfully claim the journalist's

privilege if she is involved in activities traditionally associated with the gathering and dissemination of news, even though she may not ordinarily be a member of the institutionalized press." *In re Madden*, 151 F.3d 125, 129 (3d Cir. 1998); *cf. Lund v. City of Rockford, Illinois,* 956 F.3d 938, 941 n.1 (7th Cir. 2020) ("The defendants label the Rockford Scanner an 'internet blog' and note that Lund was an unpaid reporter with "no background or education in journalism. … We note that First Amendment protection does not depend on the quality of the news source or the wages of the reporter."). Mr. O'Donnell has clearly met his burden of establishing that he is involved in activities traditionally associated with the gathering and dissemination of news, through his Declaration and in the information he has provided in discovery, including that which appears in Exhibit C to Plaintiffs' brief.

The fact that Mr. O'Donnell has helped law enforcement with their investigations into child sexual abuse within Jehovah's Witness congregations does not change the fact that he also has spent years providing information to the public through his website, other publications, and interviews. Nor does the fact that Mr. O'Donnell has provided information to attorneys who represent the victims of such abuse mean that he is not a journalist. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[4] *See* O'Donnell Decl. at ¶¶ 1-7, ECF 52-2; Def. Resp. to

---

[4] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████." Pltfs.

Pltfs. Interrogs. No. 15 and attached list of publications, Ex. C to Pltfs. Br., 58-1. Plaintiffs, notably, provide no legal citations for their arguments that the lack of a journalism degree, the use of websites for publishing, the provision of paid or unpaid consulting services in a journalist's area of expertise, or assisting law enforcement somehow defeat one's status as a journalist.

Finally, Plaintiffs contend that Mr. O'Donnell's true purpose in attending the February 16, 2023 meeting to ███████████████ and thus that he did not have the intent, "at the beginning of the news-gathering process to disseminate [] information to the public," as required by the Third Circuit. *See Madden*, 151 F.3d at 129-130. Plaintiffs offer no authority for the proposition that a journalist cannot *both* engage in newsgathering *and* ████████████████████████████ ████████████████████████████████████. But, perhaps more pertinently, Plaintiffs' argument undercuts the entire *raison d'être* of their lawsuit: that Mr. O'Donnell obtained this information and then soon after disclosed it in a public YouTube interview. Am. Compl. ¶¶ 53-61, ECF 21.

As Mr. O'Donnell explains in his Declaration, his newsgathering activities encompass more than specific instances of publication. *See* O'Donnell Decl. at ¶ 7 ("In

---

Br. at 9. Plaintiffs then refer to Mr. O'Donnell's responses to their Interrogatories, which in fact establish the opposite: ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

addition to what I have actually published, I have invested thousands of hours of work into my investigative work, some of which involve long-term investigations into specific instances or allegations of child abuse."). All of these activities serve his ultimate endeavor: "The purpose of my work as a journalist is to ensure that facts regarding child sexual abuse within Jehovah's Witness congregations and facts regarding efforts by church leaders to cover up this abuse are uncovered and disseminated to the public." O'Donnell Decl. at ¶ 3. Indeed, Mr. O'Donnell discussed what he learned through his attendance at the Teams meeting in an interview only days afterward. The fact that Mr. O'Donnell, additionally, ████████████ ████████████████████████████████████ does not even begin to suggest that he did not, when he accepted the invitation to attend the Teams meeting, intend to incorporate what he learned there into his investigative work and reporting.

### III. Plaintiffs Have Not Established That Their Need for The Source's Identity Outweighs Mr. O'Donnell's Right to Keep It Secret.

Because the identity of Mr. O'Donnell's confidential informant is protected by Reporters Privilege, in order to pierce that privilege, first Plaintiffs must prove that "the only access to the information sought is through the journalist and her sources. [and, second,] … that the information sought is crucial to the claim." *United States v. Criden*, 633 F.2d 346, 359 (3d Cir. 1980).[5] If Plaintiffs can make such a showing, the Court must then "balance on one hand the policies which give rise to the privilege

---

[5] Plaintiffs must also prove that they have "made an effort to obtain the information from other sources." *Id.* at 358-59. Defendant does not dispute that Plaintiffs have made this showing.

and their applicability to the facts at hand against the need for the evidence sought to be obtained in the case at hand." *Riley v. City of Chester*, 612 F.2d at 716.[6] Ultimately, Plaintiffs fail to meet their burden of showing that their need for the source's identity outweighs Mr. O'Donnell's right to protect his sources.

Plaintiffs first make the claim "that a journalist does not have a license to violate the law." Pltfs. Br. at 13. From this, they go on to argue that Mr. O'Donnell is "attempting to use an email chain … as a shield against liability." Pltfs. Br. at 14. Of course, Mr. O'Donnell hasn't claimed any form of immunity or "license to violate the

---

[6] Plaintiffs have also argued that Mr. O'Donnell waived his First Amendment right not to disclose the identity of his source "by placing his 'invitee' status to the Teams meeting center stage in this litigation." In support of this argument, Plaintiffs cite only one case where a court found that a reporter had expressly waived the Reporters Privilege, and that was after the reporter had affirmatively disclosed the assertedly privileged information to a third-party. *See Ayala v. Ayers*, 668 F. Supp. 2d 1248, 1250 (S.D. Cal. 2009) ("The Court finds an implied waiver of the journalist's privilege as a result of Hart's production of the manuscript to Petitioner's counsel."). That is not the situation in this case.

Rather, when addressing "waiver" arguments related to putting protected information "at issue" in the context of the Reporters Privilege, courts have recognized that any "waiver" is effectively incorporated into the privilege's burden-shifting and balancing test. *See, e.g., Inside Radio, Inc. v. Clear Channel Commc'ns, Inc.,* 208 F.R.D. 537 (S.D.N.Y. 2002) ("Thus, it is not enough that the source information be 'highly material and relevant'—*i.e.,* that it 'go[ ] to the heart of [the] defense.' The party seeking such discovery must show also that it is critical to the claim *and* that it is not obtainable from other sources.") (emphasis in original) (quoting *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir. 1982)). Similarly, under Third Circuit law, Plaintiff's proposed waiver argument would eviscerate the standard set forth in *Riley* and *Criden* requiring *both* that the challenger establish that "the only access to the information sought is through the journalist and her sources [*and*] … that the information sought is crucial to the claim," not simply that the information is "at issue," *i.e.* that it is crucial to the claim. *Criden*, 633 F.2d at 358-359. As the Third Circuit in *Riley* emphasized, this additional showing is required "[w]hen a privilege is grounded in constitutional policy." 612 F.2d at 716.

7

law." █████████████████████████████████

█████████████████████████████████████

████████████████████████. As Plaintiffs note, the fact that Mr. O'Donnell was invited to the meeting is not a defense under the Pennsylvania and Maryland wiretap laws. And whether it constitutes an effective defense under the federal wiretap statute will depend on whether Mr. O'Donnell can convince a jury that he was, in fact, invited to the meeting, and that the invitation came from a party to the meeting.[7] Plaintiffs may, of course, challenge the veracity of his account, with or without the identity of the whistleblower.

In fact, Plaintiffs and Mr. O'Donnell are equally constrained by the concealment of the identity of the whistleblower. Mr. O'Donnell will present testimony, which Plaintiffs may challenge, that the source "(1) actually exists; (2) was an active elder of one of the congregations; (3) was invited to the Teams Meeting; [and] (4) was a party to the Teams Meeting." Pltfs. Br. at 15. Similarly, Mr. O'Donnell can and will testify, if necessary, that the emails from his source "(1) are authentic; (2) are complete; and/or (3) were actually from this other individual." Pltfs. Br. at 15

Beyond this, Plaintiffs contend that they wish to investigate whether the source "(5) had the authority from the body of elders of his respective congregation and/or the other congregations to waive the attorney-client privilege and consent to Mr. O'Donnell's interception of the meeting; (6) told any of the other elders on the

---

[7] Plaintiffs' objection that the email thread may at some future time be found to be inadmissible hearsay without the sender identified is, at best, premature.

8

Teams Meeting about Mr. O'Donnell's presence, and if so, when; or (7) was acting either alone or in concert with Mr. O'Donnell 'under color of law' as an agent of the government or otherwise for a 'criminal or tortious' purpose." Pltfs. Br. at 15. But those are not issues raised by Mr. O'Donnell's defense—whether there is more than one elder in the Plaintiff congregations who wishes to provide information to Mr. O'Donnell is clearly of great interest to Plaintiffs, but it is not a proper purpose of discovery in this matter.

Against Plaintiffs' inability to show that the information is crucial to the claim, the Court must balance "the policies which give rise to the privilege and their applicability to the facts at hand." *Criden*, 633 F.2d at 359. The First Amendment reporter's privilege is "deeply rooted in the first amendment." *United States v. Criden*, 633 F.2d at 356. The privilege is recognized as essential to protect the ability of journalists to investigate and expose wrongdoing. "A journalist's inability to protect the confidentiality of sources s/he must use will jeopardize the journalist's ability to obtain information on a confidential basis." *Riley*, 612 F.2d at 714. "The reporters' privilege also attempts to protect the source from retribution. If a practice in private industry is exposed by a person in a given employment hierarchy, he risks retribution at the hands of his superiors and his peers if he is identified as the source." *Criden*, 633 F.2d at 356.

First and foremost, Mr. O'Donnell's First Amendment right to investigate and publish concerning the incidence and concealment of child sexual abuse in Jehovah's Witness congregations is of paramount public importance. Requiring reporters like

Mr. O'Donnell to divulge the identity of confidential sources in the Jehovah's Witness community will create a chilling effect on actual and potential sources within the community. *See* O'Donnell Decl. at ¶ 11. This in turn will impact the ability of Mr. O'Donnell and others to report on the ongoing illegal activity, reporting which helps ensure, among other things, that "children within the Jehovah's Witness community will be safeguarded, abusers brought to account, survivors assisted in their recovery, and corruption within the leadership of the Jehovah's Witness community rooted out." O'Donnell Decl. at ¶ 4. Moreover, the actual harm to Mr. O'Donnell's sources that would be caused by disclosure of their identity—disfellowship from the Jehovah's Witness congregations—is concrete and imminent, and further weighs against disclosure here. O'Donnell Decl. at ¶¶ 15-20.[8]

Plaintiffs contend that the harm to Mr. O'Donnell's ability to continue his investigative work is "speculative" and should be established through "specific examples." But that ignores the Third Circuit's holding that "[t]he interrelationship between newsgathering, news dissemination and the need for a journalist to protect his or her source is too apparent to require belaboring." *Riley*, 612 F.2d at 714. "Compelled disclosure of confidential sources unquestionably threatens a journalist's ability to secure information that is made available to him only on a confidential basis." *Baker v. F & F Inv.*, 470 F.2d 778, 782 (2d Cir. 1972), *cert. denied*, 411 U.S.

---

[8] Mr. O'Donnell's guaranty of confidentiality also constitutes an enforceable promise, the breach of which could subject him to personal liability with respect to any injuries caused by disclosure. *See Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991) (affirming a damages award for a journalist's breach of a promise of confidentiality).

966 (1973). Plaintiffs, unsurprisingly, do not dispute the real threat of disfellowship faced by the confidential source or its catastrophic consequences. *See Criden,* 633 F.2d at 356 ("The reporters' privilege also attempts to protect the source from retribution.").

"The first amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people,' and bottomed on 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Criden*, 633 F.2d at 355 (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957) and *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). As the Third Circuit has explained, "[t]he interests behind the Pennsylvania [Shield Law] and the federal common law in this regard are congruent, each stemming from an independent base of authority but both leading to protection of the vital communication role played by the press in a free society." *Riley*, 612 F.2d at 715. Fundamental First Amendment principles demand the protection of Mr. O'Donnell's confidential source in light of the imminent harms that would be caused by disclosure, both to the capacity for newsgathering around the Jehovah's Witnesses and to the confidential source themselves.

## IV. Conclusion

Wherefore, the Court should grant Mr. O'Donnell's motion for a protective order directing that the identity of all Mr. O'Donnell's sources remain confidential.

Dated: May 5, 2025				Respectfully Submitted,

				<u>*/s/ Mary Catherine Roper*</u>
				Mary Catherine Roper
				John J. Grogan
				David Nagdeman
				LANGER GROGAN & DIVER PC
				1717 Arch St., Ste 4020
				Philadelphia, PA 19103
				(215) 320-5660
				mroper@langergrogan.com
				jgrogan@langergrogan.com
				dnagdeman@langergrogan.com

				*Attorneys for Defendant*